IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

PAMELA MULICH as Power of Attorney for
CHARLES MCVICKER
Address:
17311 East 40 Highway Trailer L6
Indeopendence, MO 64055

Case No.

           **Plaintiff,**

JURY TRIAL DEMANDED

v.

**WILSHIRE OPERATOR, LLC D/B/A WILSHIRE AT
LAKEWOOD REHAB CENTER**
Serve:
Business Filings Incorporated
120 South Central Avenue
Clayton, MO 63105

**MO OPERATION HOLDINGS DE SPE, LLC**
Serve:
File Right Corporate Services, LLC
17032 Minos Conway Rd
Lewes, DE 19958

**ASHER MARX**
Serve:
1809 New Hampshire Ave
Toms River, NJ 08755-1313

**JACQUES WOLF**
Serve:
10 Grandview Dr.
Lakewood, NJ 08701-3881

           **Defendants.**

## PLAINTIFF'S COMPLAINT FOR DAMAGES

The Plaintiff, by and through the undersigned counsel, submits this Complaint for Damages

against the above-named Defendants, and in further support, states and alleges as follows:

1

PLAINTIFF

1.      Pamela Mulich is the Power of attorney for Charles McVicker.

2.      The Power of Attorney authorizes Ms. Mulich to:

*any reasonable expenses incurred in connection with such services; and*

*C. M. 16. **Power to Sue Third Parties Who Fail to Act Pursuant to Power of Attorney**. If any third party (including stock transfer agents, title insurance companies, banks, credit unions, and savings and loan associations) with whom my attorney-in-fact seeks to transact refuses to recognize my attorney-in-fact's authority to act on my behalf pursuant to this Power of Attorney, I authorize my attorney-in-fact to sue and recover from such third party all resulting damages, costs, expenses, and attorney's fees incurred because of such failure to act. The costs, expenses, and attorney's fees incurred in bringing such action shall be charged against my general assets, to the extent that they are not recovered from said third party. |*

3.      Charles McVicker ("Resident") suffered an avoidable pressure injury during his stay at Wilshire Operator, LLC, d/b/a Wilshire at Lakewood Rehab Center, a nursing home located at 600 N E Meadowview Drive, Lees Summit, MO 64064 ("The Facility or Facility").

4.      Plaintiff, Charles McVicker, is and always relevant hereto, an adult over the age of 21 and a citizen of Missouri.

DEFENDANTS

5.      Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

**WILSHIRE OPERATOR, LLC D/B/A WILSHIRE AT LAKEWOOD REHAB CENTER**

6.      At all times relevant, Wilshire Operator, LLC, was a Missouri business and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Wilshire at Lakewood Rehab Center ("Facility" or "the Facility") located at 600 N E Meadowview Drive, Lees Summit, MO 64064.

2

7. As such, Wilshire Operator, LLC, was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

8. Consequently, Wilshire Operator, LLC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

## MO OPERATION HOLDINGS DE SPE, LLC

9. At all times relevant to this action, Defendant MO OPERATION HOLDINGS DE SPE, LLC, was a Delaware company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

10. At all times relevant, MO OPERATION HOLDINGS DE SPE, LLC, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

11. MO OPERATION HOLDINGS DE SPE, LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a. Staffing budgets.

    b. The development and implementation of nursing policies and procedures.

    c. The hiring and firing of the administrator; and

    d. Training and supervising nursing staff persons.

12. These actions and business decisions had a direct impact on the care provided to all residents including Resident.

13. Consequently, MO OPERATION HOLDINGS DE SPE, LLC, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

**ASHER MARX**

14. At all times relevant to this action, Defendant Asher Marx, was an engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

15. At all times relevant, Asher Marx, and/ or individuals or entities acting on their behalf, owned operated, managed, maintained, and/or controlled – in whole or in part- the Facility.

16. Asher Marx, and/or individuals or entities acting on their behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a. Staffing budgets.

    b. The development and implementation of nursing policies and procedures.

    c. The hiring and firing of the administrator; and

    d. Training and supervising nursing staff persons.

17. These actions and business decisions had a direct impact on the care provided to all residents including Resident.

18. Consequently, Asher Marx, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

19. At all times relevant to this action, Defendant Jacques Wolf, was an engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

20. At all times relevant, Jacques Wolf, and/ or individuals or entities acting on their behalf, owned operated, managed, maintained, and/or controlled – in whole or in part- the Facility.

21. Jacques Wolf, and/or individuals or entities acting on their behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a. Staffing budgets.

    b. The development and implementation of nursing policies and procedures.

    c. The hiring and firing of the administrator; and

    d. Training and supervising nursing staff persons.

22. These actions and business decisions had a direct impact on the care provided to all residents including Resident.

23. Consequently, Jacques Wolf, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

### DEFENDANTS' JOINT ENTERPRISE/VENTURE

24. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

25. Defendants Wilshire Operator, LLC, and MO OPERATION HOLDINGS DE SPE, LLC, Asher Marx, and Jacques Wolf ("Joint Venture Defendants") were engaged in a joint venture in that:

    a. The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, a Missouri licensed skilled nursing facility.

    b. The Joint Venture Defendants had had a common purpose to operate the Facility, a Missouri licensed skilled nursing facility.

    c. The Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, a Missouri licensed skilled nursing facility; and

    d. The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, a Missouri licensed skilled nursing facility.

    e. There has been always a close relationship between the Joint Venture Defendants relevant.

26. Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Facility.

**JURISDICTION AND VENUE**

27. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

28. Wilshire Operator LLC is a Missouri limited liability company.

29. The only member of Wilshire Operator LLC is MO OPERATION HOLDINGS DE SPE, LLC.

30. MO OPERATION HOLDINGS DE SPE, LLC is a Delaware limited liability company.

31. The members of MO OPERATION HOLDINGS DE SPE, LLC are Asher Marx and Jacques Wolf.

32. Asher Marx is a citizen of New Jersey.

33. Jacques Wolf is a citizen of New Jersey.

34. Thus, Wilshire Operator LLC is a citizen of the state of New Jersey by way of its members being citizens of New Jersey.

35. Plaintiff is a citizen of Missouri.

36. Therefore, Plaintiff brings his claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

37. Wilshire Operator, LLC, or somone on its behalf reprecentted to the United States Centers for Medicare and Mediciaid Services ("CMS") that Asher Marx; Jacques Wolf; and MO Operation Hioldings DE SPE, LLC exercised operational and/or managerial control over WILSHIRE OPERATOR, LLC.

# Ownership

 Print

| Legal business name | Ownership type | Contact info |
|---|---|---|
| Wilshire Operator LLC | For profit - Limited Liability company | 600 N E Meadowview Drive<br>Lees Summit, MO 64064<br>(816) 554-9866 |

| Affiliated entity name | Affiliated entity ID |
|---|---|
| AMA HOLDINGS | 27 |

Open affiliated entity performance information

## Owners and managers of Wilshire at Lakewood Rehab Center

**OWNER**

5% or greater direct ownership interest

| | |
|---|---|
| MO OPERATION HOLDINGS DE SPE LLC (99%) | since 01/25/2024 |

5% or greater indirect ownership interest

| | |
|---|---|
| AMA HOLDINGS LLC | since 01/01/2022 |
| DEF HOLDINGS LLC | since 01/01/2022 |
| MARX, ASHER | since 01/01/2022 |
| WOLF, JACQUES | since 01/01/2022 |

**OPERATIONAL/MANAGERIAL CONTROL**

| | |
|---|---|
| MARX, ASHER | since 01/01/2022 |
| MO OPERATION HOLDINGS DE SPE LLC | since 01/25/2024 |
| WOLF, JACQUES | since 01/01/2022 |

https://www.medicare.gov/care-compare/details/nursing-home/265700?id=48d26307-feec-

4695-9d10-e3ac2b535efd&state=MO&measure=nursing-home-ownership

38. CMS Form 855a — The Medicare Enrollment Application — required WILSHIRE OPERATOR, LLC to report to the federal government any entity that "exercises operational or managerial control over the provider or conducts the day- to-day operations of the provider, is a managing organization and must be reported." Any individual or entity exercising operational or managerial control over Facility were responsible for ensuring the deviations of the of the standard of care described above did not occur.

39. Here, WILSHIRE OPERATOR, LLC reported to CMS that Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC exercised operational or managerial control over the facility during Resident's residency.

40. Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, WILSHIRE OPERATOR, LLC by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of WILSHIRE OPERATOR, LLC.

41. Through this role Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC committed tortious acts within the State of Missouri and personal jurisdiction is therefore appropriate exercised over Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC.

42. These actions and decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

43. Moreover, Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC operated, managed, maintained, and/or controlled WILSHIRE OPERATOR, LLC by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of WILSHIRE OPERATOR, LLC that could and should have been utilized to hire enough nursing staff.

44. These actions and business decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

45. Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC knowingly participated in the tortious conduct at issue in this case.

46. Consequently, Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC owed a duty to Resident to use reasonable care for Resident's safety while under his care and supervision at WILSHIRE OPERATOR, LLC.

47. Specifically, pursuant to RSMo § 506.500.1(3), defendants — including Asher Marx; Jacques Wolf; and MO Operation Holdings DE SPE, LLC in their role as individuals and entities charged with exercising operation/managerial control over the Facility — purposefully availed themselves of the protections and/or benefits of the laws in Missouri by committing tortious acts within the state including, but not limited to, failing to ensure that Columbia Manor Health & Rehabilitation had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

48. A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Missouri, thereby making venue proper in this Court.

AGENCY

49. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

50. The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

51. Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

52. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

### Defendants' Treatment of Resident

53. Resident was admitted to the Facility on March 13, 2023.

54. Upon information and belief, Resident was at risk for developing pressure injuries.

55. Upon information and belief, none of the Facility staff implemented or applied the appropriate interventions to address Resident's risk for developing pressure injuries.

56. Upon information and belief, from admission to his discharge, none of the Facility staff:

    a. Properly assessed Resident's risk of developing pressure injuries.

    b. Implemented or provided the appropriate interventions to prevent Resident from developing pressure injuries, including appropriate supervision and pressure injury preventions.

    c. Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

    d. Monitored Resident's condition, including Resident's risk for developing a pressure injury during this time frame.

57. Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever provide any sort of

in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries  in residents like Resident.

58.     Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting pressure injuries in residents like Resident.

59.     Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate number of staff working daily at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable pressure injury, or monitor and adequately supervise Resident's condition.

### Management of the Facility

60. Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program.  Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.

61. The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and according to the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities.

Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

62. For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by the Center for Medicare Services ("CMS").

63. This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident at varying intervals depending on the resident's circumstance.

64. The RAI form is known as the Minimum Data Set ("MDS") and must be certified to SMD by a registered nurse on behalf of the facility.

65. The MDS information provided by the facilities for each resident is processed and the CMS assigns a corresponding "RUG Score" which indicates a resident's acuity and reimbursement rate.

66. A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses. This information is used to slot the resident into a RUG.

67. MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression. At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.

68. The completion of an MDS by a skilled nursing facility is part of the federally mandated process for clinical assessments of all residents in nursing facilities. It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

69. MDS's need to be as detailed and comprehensive as possible so that they reflect all the needs of each of the residents in the nursing facility.

70.     When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all the health problems of each of their residents.

## Cost Reporting & Staffing information

71.     Nursing facilities, like The Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10". The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

72.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RN's, LPN's, and CNA's. the cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

73.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident, per day, for the time covered by that cost report. This number is referred to as the "reported HPPD".

74.     CMS allows the facilities to include all paid hours in the "reported HPPD". Thus, that number reflects true direct care hours, but it is inflated because "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

75.     The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

76.     To determine more accurate direct care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employee's work. This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data

Reports", or some other similarly named report depending on the time-keeping system used by the nursing facility.

77.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility. This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period including a year, a quarter, a month, or a day.

78.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time Resident was at the facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

<b>Undercapitalization/Underfunding at the Facility</b>

79.     Defendant had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the residents' comprehensive assessments and plans for care.

80.     Defendant had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

81.     Upon information and belief, Wilshire Operator, LLC, d/b/a Wilshire at Lakewood Rehab Center had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

82.     Upon information and belief, no individuals at the Facility are involved in the decision making about financial operations or what resources were and where they would be spent.

83. MO OPERATION HOLDINGS DE SPE, LLC had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

84. MO OPERATION HOLDINGS DE SPE, LLC had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

85. The Facility had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

86. No individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

87. Transactions directed by MO OPERATION HOLDINGS DE SPE, LLC left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

## LEGAL BASIS FOR WILSHIRE OPERATOR, LLC, MO OPERATION HOLDINGS DE SPE, LLC; ASHER MARX AND JACQUES WOLF'S LIABILITY

### Joint Venture/Enterprise

88. The Facility, Wilshire Operator, LLC; MO OPERATION HOLDINGS DE SPE, LLC; Asher Marx and Jacques Wolf are collectively referred to herein as the "Corporate Defendants."

89. The Corporate Defendants directed, operated, and managed the day-to-day functions of their skilled nursing facilities – including the Facility – by and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

90. These policies manipulate and control the physical and financial resources and prohibit decision making at the Facility level.

91. This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

92. The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

93. Upon information and belief, such operations included the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.

94. The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

95. The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

      a. The shared interest in the operation and management of skilled nursing facilities.

b. The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

c. The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing skilled nursing facilities.

96. Missouri law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

97. The Corporate Defendants share a common interest in the operation and management of skilled nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of skilled nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing skilled nursing facilities for profit.

98. The Corporate Defendants and Wilshire Operator, LLC, took direct, overt, and specific actions to further the interest of the joint enterprise.

99. These actions were taken through a joint venture/enterprise or through the Corporate Defendants and Wilshire Operator, LLC's officers, directors, managers and or employees.

100. The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

101. Further, because the Corporate Defendants and Wilshire Operator, LLC, were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of the Facility.

**Direct Participation/Individual Actions**

102. The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of skilled nursing facilities throughout the Missouri and

the country. One such skilled nursing facilities was the Facility where Resident was admitted for care and treatment.

103.   At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their skilled nursing facilities – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the skilled nursing facilities; and, (3) payor mix.

104.   At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, the Corporate Defendants determined:

a.   The number of staff allowed to work in their chains of skilled nursing facilities including the Facility.

b.   The expenditures for staffing at the skilled nursing facilities including the Facility.

c.   The revenue targets for each skilled nursing facilities including the Facility.

d.   The payor mix, and census targets for each skilled nursing facilities including the Facility.

e.   Patient recruitment programs and discharge practices at each skilled nursing facilities including the Facility.

105.   All cash management functions, revenues and expenditure decisions at the skilled nursing facilities level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

106.   It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

107. The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

108. The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

109. Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

110. Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

111. Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

112. The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

113. At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

114.     In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed skilled nursing facility, in this case the Facility, by the State of Missouri.

**Corporate Malfeasance**

115.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

116.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

117.     These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon the Corporate Defendants and the Facility.

118.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

119.     During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating the Facility.

120.     During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.

121.     The Corporate Defendants manage, operate, and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

122.     The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

a.  Chosen to disregard the duties and responsibilities which the Facility, as a licensed skilled nursing facility, owed to the State of Missouri and its residents.

b.  Created the dangerous conditions described by interfering with and causing the Facility to violate Missouri statutes, laws and minimum regulations governing the operation of said skilled nursing facilities.

c.  Superseding the statutory rights and duties owed to skilled nursing facilities residents by designing and mandating dangerous directives, policies, management, and day to day operation of the Facility.

d.  Caused the harm complained of herein; and

e.  Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### (Count I - (Negligence v. All Defendants)

123.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

124. At all times material hereto, Patient was in a defenseless and dependent condition.

125. As a result of Patient's defenseless and dependent condition, Patient relied upon Defendant to provide for their safety, protection, care, and treatment.

126. At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendant, and its agents and employees, owed a legal duty to Patient to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

127. At all relevant times, Defendant had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a Hospital.

128. These duties required Defendant to implement and enforce policies and procedures to ensure the proper care for, and treatment of all patients including Patient.

129. These duties required Defendant to have sufficient and qualified staff at the Hospital to ensure the proper care for, and treatment of all patients including Patient.

130. These duties required Defendant to ensure that the Hospital's nurses and other staff were properly educated and trained regarding the care for, and treatment of all patients including Patient.

131. These duties required Defendant to ensure that the Hospital was properly capitalized to ensure the proper care for, and treatment of all patients including Patient.

132. Specifically, during their care and treatment of Patient, Defendant and its agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

a. Failing to adequately assess, monitor, document, treat, and respond to Patient's physical condition as well as Patient's risk of developing pressure injuries.

b. Failing to adequately assess Patient's risk of developing pressure injuries.

c. Failing to timely, consistently, and properly monitor, assess, and document Patient's physical condition.

d. Failing to provide adequate nursing staff to ensure Patient's 24-hour protective oversight and supervision.

e. Failing to have enough staff at the Hospital to ensure Patient's needs were being met regarding developing pressure injuries.

f. Failing to provide adequate assistive devices and interventions to prevent Patient's developing pressure injuries.

g. Failing to enact and carry out an adequate Care Plan regarding Patient's increased risk for developing pressure injuries.

h. Failing to provide adequate assistance and assistive devices to prevent Patient's developing pressure injuries.

i. Failing to utilize proper procedures for preventing developing pressure injuries.

j. Failing to prevent the development and worsening of Patient's developing pressure injuries.

k. Failing to timely report Patient's changes in condition to a physician.

l. Failing to adequately, timely and consistently prevent, assess, and treat Patient's developing pressure injuries.

m. Failing to timely transfer Patient to a Hospital that could provide adequate care.

n. Failing to properly supervise and train the employees of the Defendant who were responsible for the care and treatment of Patient.

o. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Patient's developing pressure injuries.

p. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

133. As a direct and proximate result of the Defendant's acts resulting in an understaffed hospital while Patient was at Facility, Patient was harmed and suffered including pain, suffering, and mental anguish.

WHEREFORE, Plaintiff prays for judgment against Defendant in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances.

<u>PLAINTIFF DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE</u>

Respectfully Submitted,

STEELE LAW FIRM II, LLC

By: */s/ Dusty Gleason*
Dusty Gleason MO #76301
Jonathan Steele MO #63266
2029 Wyandotte Suite #100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
dusty@nursinghomeabuselaw.com
jonathan@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF(S)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on September 5, 2024 a copy of the above and foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system to all parties and attorneys of record.

*/s/ Dusty Gleason*
Attorney for Plaintiff(s)